Opinion issued May 24, 2012.


 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 

 


In The

Court of
Appeals

For The

First District
of Texas

————————————

NO. 01-10-00823-CR

———————————

Judy Hurta Domel, Appellant

V.

The State of
Texas, Appellee



 



 

On Appeal from the 434th Judicial District Court 

Fort Bend County, Texas



Trial Court Case No. 05-DCR-042878A

 



 

MEMORANDUM OPINION

          A
jury found appellant, Judy Hurta Domel, guilty of the third-degree felony
offenses of theft[1]
and misapplication of fiduciary property.[2]  The trial court assessed her punishment at confinement
for ten years, suspended the sentence, placed appellant on community
supervision for two years, and ordered that she serve six months in jail and
pay $72,000 in restitution.  In three
issues, appellant contends that the evidence is legally insufficient to support
her convictions and the trial court erred in submitting, in its charge to the
jury, an instruction that “did not require a unanimous jury verdict” for each
offense “independent of each other” and not submitting appellant’s requested instructions
to the jury.

          We
affirm.

Background

          Steve
Clugston, a former assistant superintendent for the Needville Independent
School District (“NISD”), testified that he began working for NISD in June
2003.  One of his duties was to supervise
NISD’s “food service department,” overseeing the school cafeterias at the NISD
elementary, intermediate, middle, junior high, and high schools.  Each cafeteria employed a cashier who was
responsible for collecting breakfast or lunch money and completing an
“accounting sheet” that reflected how each child had paid for his or her meal,
a “cash sheet” that reflected the amount of money collected by the cashier, and
a “deposit slip” that reflected the total amount of cash and checks.  The forms and the money were then collected
by Cathy Bracewell and sent to appellant, who was Clugston’s secretary and
responsible for “verify[ing] that deposit,” making copies of the forms, and
keeping the original forms on file “so that [they] had a paper trail of the
accounting of the money.”  Appellant was
to make sure that the numbers on the accounting sheet matched those on the
final deposit slip beyond any minor discrepancies.  The money was placed in locked bags in a safe
at the back of the administration building, and Larry Lott, a maintenance
worker, would deposit the money at the bank and return the bank deposit slips
to appellant.  From 2003 to 2004,
appellant did not report “any shortages of money or discrepancies between the
campus and her accounting.”  

          For
the 2004–2005 school year, NISD hired
Chartwell’s Dining Services, a cafeteria managing company, to supervise its
cafeterias, and Florinda Parnell was assigned by Chartwell’s to manage NISD’s
account.  In August 2004, Parnell
expressed a concern that the deposits didn’t “match[] the amount of food that
was being used.”  Clugston suspected that
someone was taking money “at the cashier level,” so he told Bracewell and
Parnell to observe the cashiers, but they “didn’t feel like that was where
[the] problem was.”  Suggesting that Bracewell
was involved, Clugston instructed Parnell to collect and count the money, but
she found no discrepancies.  Parnell then
took the deposits to appellant’s office, and, when Clugston checked the final
deposit that was sent to the bank, it was off by approximately $400.  Clugston immediately reported the problem to
the superintendant and “started pulling some records,” comparing the bank
deposit slips with those found in appellant’s office “to see if it was a one-time
occurrence or if [they] had a systemic problem.”  Through this process, Clugston discovered
“numerous discrepancies” over the past year, ranging from forty dollars to
“several hundred dollars.”  Clugston met
with appellant to ask her about the discrepancies, but she “couldn’t answer the
question.”  NISD then placed appellant on
paid leave and began collecting records for the 2003–2004 school year.

          While
going through appellant’s files, Clugston occasionally found accounting forms
that appeared to be altered or “completely rewritten.”  He rarely found original “cash sheets” or
deposit slips prepared at the cafeterias, although appellant was required to
keep the original versions of these documents and there was “really not a
reason to rewrite” any of the forms. 
After the completion of the investigation, the NISD police chief had
Clugston place the records in a vault at the high school.  Clugston then identified several examples
demonstrating that the deposit slips found in appellant’s office did not match
those obtained from the various school cafeterias, either in the amount of cash
collected or the amount of students who had bought a meal.  Clugston concluded that there was “a systemic
problem” concerning the accounting at all of NISD’s cafeterias and the
discrepancies between appellant’s deposit slips and the records obtained from
the school cafeterias were a “normal occurrence.”  After reviewing all of the documents,
Clugston found a discrepancy of $16,782.13 concerning the elementary school,
$11,916.75 concerning the middle school, $18,452.71 concerning the junior high
school, and $48,000 concerning the high school. 
He noted that appellant had repeatedly stated to him that there had been
only minor discrepancies in the cafeteria’s deposit slips.  Alarmed, Clugston reviewed documents dating
back to May 2002, discovering a loss of $17,735.34 at the elementary school for
the 2002–2003 school year.       

          On
cross-examination, Clugston conceded that it was possible that another person
had taken the money before it had reached appellant.  Appellant never admitted to taking any money,
no one saw her take any money, and several office workers had access to the
safe where the money was kept.  Clugston
admitted that he was not aware of any complaints about appellant before he
started working at NISD, and, before his arrival, appellant had reported some
“deposits being off” and complained that “money [was] being delivered by
different people to the office at different times.”  Clugston explained that in August 2004, a
missing money bag was found in the office of Pat Garcia, NISD’s high school
cafeteria manager.  

          Parnell
testified that she oversaw the NISD cafeterias as an employee of Chartwell’s
starting in July 2004.  Shortly after her
arrival, Parnell asked appellant for documents pertaining to the amount of
money received and the number of students served at the cafeterias.  The next day, Parnell informed Clugston that
the documents revealed that “the money amounts were not . . . right for the
amount of students that we had in the district,” particularly at the high
school.  Clugston reported the
discrepancies to the NISD superintendant and directed Parnell to “make sure
that cashiering procedures were put into place and start checking . . . the
deposits.”  Clugston and Parnell then
approached appellant and asked her to read off the deposit slips from the bank,
and Parnell indicated to Clugston that the numbers did not match the forms that
she had collected from the school cafeterias. 
Appellant, who had not reported any discrepancies to Parnell or Clugston,
was placed on leave the following week “until further investigation.”  Parnell observed the cashiers, Bracewell, and
“the managers who were running the money over,” but it did not appear that any
of them were taking money.  Parnell
explained that, after appellant was placed on leave, the accounting sheets
balanced out with the deposit slips.  On
cross-examination, Parnell admitted that the money collecting procedures were
inadequate when she arrived at NISD and “seven or eight” different people had
access to the safe where the money was kept. 
    

          Lott
testified that he performed various maintenance tasks for NISD in 2003.  One of his jobs was to pick up money bags
from appellant, take them to the bank, and then take them back to the school
cafeterias.  The bags were always locked
when Lott received them, and he did not have a key to open the bags.  When picking up the bags to take them to the
bank, Lott would sometimes obtain them directly from appellant’s office.  Other times, a secretary would go and obtain
them from the safe.  On
cross-examination, Lott explained that many of the secretaries in the
administration office had access to the safe where the money bags were
sometimes kept.     

          Vanessa
Dannhaus, a cashier at the NISD elementary school cafeteria in 2003, testified
that she kept track of the amount of students who bought a meal using a
“clicker” and tallied how the students paid for their meals.  After lunch, she would fill out an accounting
form using the information on her clicker and check those numbers with the
amount of money she had received. 
Dannhaus would also fill out the “cash sheet” reflecting the types of
currency she received, a deposit slip reflecting the total amount of cash and
checks, and a “personal form” that compared the two so she could verify the
amount of money.  For each form, she
would make a copy and put the original along with the money in a locked vinyl
bag.  Dannhaus would then give those bags
to the principal or cafeteria manager to take to the administration office.  At some point, appellant instructed her to
stop sending the “personal form” because it was not required by the
administration.  Dannhaus did not believe
that she was ever short on money when she sent it to the administration office,
and she never received any information from appellant or anyone else that her
deposit slips were incorrect.  She did
not know why appellant would have to edit or revise the forms that she
submitted.  

Following Dannhaus’s testimony,
cashiers from the other campuses testified to similar procedures and confirmed
that the deposit slips from appellant’s offices were often rewritten or altered
from the forms they had filled out on their campus.  For example, Sallie Torres, a cashier at the
NISD middle school, testified that she filled out an accounting sheet and a
deposit slip every day, she sent the originals to the administration office,
and the deposit slips found in appellant’s office did not match her own
records.  Vivian Jedlicka, a cashier at
the NISD junior high school, noted that one of appellant’s forms had omitted
the money received at the snack bar, and she identified other altered or
rewritten documents from appellant’s files. 
Carrie Hartfiel, the cashier at the NISD high school, testified that she
always sent the three pertinent documents to the administration office and
appellant’s deposit slips sometimes omitted sales of cookies or ice cream.  She noted that several of appellant’s deposit
slips demonstrated a difference of $100 between the money Hartfiel had accounted
for and the money actually deposited at the bank. 

Bracewell testified that in 2003,
she was promoted to NISD’s cafeteria supervisor.  Every day, a cafeteria manger or school
principal would bring to her a bag containing money, “their daily slips, cashiering
slips[,] and any invoices.”  Bracewell
would take those bags, which were generally unlocked, to appellant’s office in
the administration building. 
Occasionally, appellant would inform Bracewell that the amount of money
did not match the accounting forms, but Bracewell never instructed appellant to
“correct” the issue on the forms.  On
cross-examination, Bracewell explained that she believed that the money “went
through too many hands.”       

Dovie Brown, NISD’s Director of
Finance, testified that she would occasionally fill in for appellant by
verifying the amount of money in the bags with the forms.  Each bag contained money, a deposit slip, an
accounting sheet, and a cash sheet.  When
Brown filled in for appellant, she never discovered any discrepancies between
the forms and the amount of money in the bags. 
Several of the secretaries in the administration building had access to
the safe in which the money was kept, as did the tax collector, Bernie Novak.  Each afternoon, Bracewell would bring the
money bags from the campus cafeterias to appellant, who was supposed to verify
the amount of money enclosed with the forms. 
After the amount was verified, the money was placed in the safe, which
was locked at all times and located at the back of the administration
building.  The next morning, Lott would
pick up the bags and take them to the bank. 


Brown would use the deposit slips
received from the bank to fill out a “general ledger” tracking the total
revenue that the district was bringing in. 
However, she never verified the amount of money coming in from the food
service department because “that was [appellant’s] responsibility.”  In 2003, because there was a shortage in
revenues from the food service department, Brown had to transfer $77,000 from
the district’s general fund to the food service department. She explained that
when she reviewed the documents from appellant’s office and the campus
cafeterias, she discovered that the bank deposit slips always matched
appellant’s documents but not necessarily those at the campus cafeterias.  From 2002 to 2004, Brown noticed a total
difference of $80,913.60 from the deposit slips received from the bank and the
amount of money that should have been deposited as indicated by the campus
cafeteria documents.  Appellant never
alerted Brown to any discrepancies in the amount of money she received.

Brown further testified that
approximately once a month, appellant would go on “gambling trips” and “she was
always talking about . . . how much money she had won,” but she never “talked
about any losses.”  She also told Brown
that she was able to pay off the loan on her car “very quickly.”  From 2002 to 2004, appellant made
approximately $25,000 a year, after taxes, at her job with NISD.  Brown explained that when she inspected
appellant’s bank accounts, she discovered that, from January 2002 through April
2005, appellant had deposited $87,375 in cash in her Prosperity bank savings
account and $35,970 in cash into her Southwest Bank savings account.  On cross-examination, Brown admitted that she
did not know for sure from where appellant’s cash deposits had come and Brown
was not “licensed” as an accountant.

Shirley Warncke, who worked in the
NISD administration office for accounts payable, testified that Brown had told
her that she did not like appellant. 
Warncke opined that Brown, Clugston, or Jennifer Michalec, the Benefits
Administrator, could have taken NISD’s money. 
She explained that there had been reports of money missing at NISD
before appellant had started working there and the reports of missing money
began after Brown was hired.  Appellant
had also told Warncke, “at least once or twice,” that she would receive bags of
money from the campus cafeterias with no corresponding accounting sheets.  Occasionally, appellant would not have time
to count the money on the same day that she had received it, so she left the
money in the safe overnight and counted it the next morning.  Warncke also recounted an incident in which
appellant placed her own money into the bags to make the total amount
consistent with the deposit slips. 
Warncke did not believe that appellant could have taken the money
because “[s]he’s from a well-known family and her dad was on the school board.”  She also explained that the safe was kept
unlocked until the “point where money started missing.”  

After NISD placed appellant on
administrative leave, Warncke assumed her responsibilities and noticed that
money was often miscounted and she received the deposit slips, but not the
accounting forms, from the campus cafeterias. 
She also opined that Clugston was “like a used car salesman” and had an
“ongoing feud” with appellant during her time at NISD.  After Warncke’s testimony, several other NISD
secretaries and assistant superintendents testified that they believed that
appellant was trustworthy and would not steal money from the district.

Appellant testified that, at first,
the principals or cafeteria managers from each campus would bring the money
bags to her, but, starting in 2003, Bracewell was reassigned as a “food service
director” and given the responsibility of transporting all of the bags to the
administration office.  Appellant would
“occasionally” receive “some of the paperwork,” but she generally received only
money from the campus cafeterias.  Other
times, she would receive paperwork that was only partially completed, but she
never received the “accounting sheets” and did not even know of their
existence.  When appellant asked her
direct supervisor, Kathryn Winkler, about the proper procedure to follow when
she received money but not paperwork, Winkler told her to fill out her own
deposit slip after counting the money herself. 
Appellant usually would not have time to verify the amount of money before
she had to leave for the day, so she would leave the bags in the safe overnight
and verify the amount of money the next morning, when she often found the safe
left open.  She explained that the safe
was open “to pretty much everyone” that worked in the administration building
and the money bags frequently came to her unlocked.  Appellant explained the cash deposits, noting
that she and her husband had sold their two cars for cash and deposited the
proceeds into their savings accounts.  In
addition, she would go about every six weeks to the Coushatta Casino to gamble,
and she received cash from her sons as loan repayments.       

Sufficiency of the Evidence

In her first issue, appellant argues that the evidence is
legally insufficient to support her conviction because it was “entirely
circumstantial” and “failed to establish” her guilt beyond a reasonable doubt.

We review the legal sufficiency of the evidence “by
considering all of the evidence in the light most favorable to the prosecution”
to determine whether any “rational trier of fact could have found the essential
elements of the offense beyond a reasonable doubt.”  Jackson v. Virginia, 443 U.S. 307, 318–19, 99 S. Ct.
2781, 2788–89 (1979).  Our role is that
of a due process safeguard, ensuring only the rationality of the trier of
fact’s finding of the essential elements of the offense beyond a reasonable
doubt.  See Moreno v. State, 755 S.W.2d 866, 867 (Tex.
Crim. App. 1988).  We give deference to
the responsibility of the fact finder to fairly resolve conflicts in testimony,
to weigh evidence, and to draw reasonable inferences from the facts.  Williams v. State, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).  However, our duty requires us to “ensure that
the evidence presented actually supports a conclusion that the defendant
committed” the criminal offense of which he is accused.  Id.  

We note that when reviewing challenges to the sufficiency of
the evidence, the standard of review is the same for both direct and
circumstantial evidence cases.  See Kutzner v. State, 994 S.W.2d 180,
184 (Tex. Crim. App. 1999). 
Circumstantial evidence may be probative of a defendant’s guilt and is
sufficient by itself to establish guilt. 
Guevara v. State, 152 S.W.3d
45, 49 (Tex. Crim. App. 2004). 
Circumstantial evidence may also be considered as probative as direct
evidence in establishing the guilt of an actor. 
Id.  

A person commits the
third-degree felony offense of theft if the person unlawfully appropriates
property with intent to deprive the owner of property, and the value of the
property stolen is $20,000 or more but less than $100,000.  Tex.
Penal Code Ann. § 31.03(a), (e)(5) (Vernon Supp. 2011).  Appropriation of property is unlawful if it
is without the owner’s effective consent. 
Id. § 31.03(b)(1).  A person commits the third-degree felony
offense of misapplication of fiduciary property if the person “intentionally,
knowingly, or recklessly misapplies property [s]he holds as a fiduciary . . .
in a manner that involves substantial risk of loss to the owner of the property
or to a person for whose benefit the property is held,” and the value of the
property is $20,000 or more but less than $100,000.  Id. § 32.45 (b), (c)(5) (Vernon
2011).  

Appellant asserts that
the State “could not show that [a]ppellant was ever in exclusive possession of
any of the proceeds” and “[i]t was undisputed that the proceeds from the
different cafeterias were kept in a safe . . . to which at least six different
people had access, and which was often unlocked.”  Appellant also argues that the evidence
against her “was entirely circumstantial since no one ever observed [a]ppellant
taking the money.”

Here, it is undisputed
that one of appellant’s responsibilities was to collect the breakfast and lunch
money from the campus cafeterias every afternoon and verify that she had
received the correct amount of money. 
Cashiers at the elementary, middle, junior high, and high schools all
testified that they had properly filled out deposit slips, accounting sheets,
and cash sheets every day and included the original documents in the money bags
that were sent to appellant’s office.  When
they compared the deposit slips from appellant’s office with the copies of
their own forms, they all testified that appellant had filled out her own
deposit slips that sometimes altered their accounting, such as by not
accurately reflecting the number of students who had purchased meals or by
omitting sales for the snack bars. 
Clugston testified that he found what he opined were some original
accounting forms from the cafeterias that were nevertheless altered.  Bracewell testified that the managers from
each cafeteria would give her a money bag that included the original versions
of the accounting sheets and cash sheets completed at the campuses, and she
would deliver the bags straight to appellant’s office.  

Bracewell also
testified that some days, appellant would immediately start counting the money
when Bracewell delivered it.  Jennifer
Michalec, the NISD Benefits Administrator who worked in the administration
office alongside appellant, testified that appellant normally would finish
verifying the amount of the money in the afternoon and then leave it in the
safe overnight.  Brown testified that
appellant was supposed to verify the amount of the money the afternoon that she
received it and she had regularly seen appellant verify the amount of money at
that time.  

Parnell testified that
when she began working at NISD in July 2004, she quickly noticed that the
deposits were low for the amount of students that the cafeterias served.  When she inspected appellant’s deposit slips,
Parcell found that they did not match the accounting form copies at the various
campuses.  Brown reviewed the documents
spanning from 2002 to 2004 and noticed a total difference of $80,913.60 from
the amount of money actually deposited and the amount of money received from
students as reflected in the cashiers’ forms.  Both Clugston and Brown testified that
appellant had never reported to them a shortage of money or that she did not
receive the requisite forms from the cafeterias. 

When he discovered the
discrepancies in accounting, Clugston first instructed Bracewell and Parnell to
observe the cashiers and the cafeteria managers, but they did not report
anything indicating that money was being removed at that level.  Parnell testified that she had observed
Bracewell as well and did not believe that she had removed any money.  Clugston testified that one day he had
Parnell, instead of Bracewell, transport the money bags to appellant, and the
final deposit was off approximately $400 for that day.  Finally, Brown testified that she had
reviewed appellant’s bank accounts from January 2002 through April 2005 and
discovered cash-only deposits totaling $87,375 into one savings account and
$35,970 into another.

In support of her
argument that the above evidence is legally insufficient to support her
conviction, appellant relies on Martinez
v. State, 198 S.W.3d 36 (Tex. App.—Corpus Christi 2006, no pet.).  In Martinez,
the defendant, a middle school cafeteria manager, was convicted of theft by
deception by a public servant.  Id. at 39–40.  Her responsibilities included counting the
proceeds from “cafeteria and snack bar sales,” completing a deposit slip, and
“turn[ing] over the money for safekeeping.” 
Id. at 40.  After giving the money to a police officer,
who transported the money to the bank, the defendant received a call from a
bank teller informing her that the deposit was twenty dollars short.  Id.
at 45.  The bank returned the money to
the school’s central office, and, two days later, the defendant alleged that
she found the twenty dollars under a stack of papers on her desk, retrieved the
bag from the central office, took it back into the cafeteria, and replaced the
missing twenty dollars.  Id. 
The defendant then asserted that when she returned the bag to the
central office, the police officer who had arrived to pick up that day’s
deposit instructed her to combine the corrected deposit with that day’s deposit
into one bag.  Id.  However, the officer
testified that he did not instruct her to combine the deposits and, in fact, he
did not even pick up any money for the day in question.  Id.
at 46.  Instead, he picked up only one
bag on the following day and did not receive the incorrect deposit bag that had
been sent back.  Id. at 46–47.  The bank never
received a corrected deposit bag.  Id. at 48.

The court held that
the evidence was factually insufficient to support the defendant’s conviction
because of the “numerous inconsistencies in the lax security and cash-handling
measures involving the missing deposit.” 
Id. at 59.  However, in conducting its legal-sufficiency
review, the court held that “a rational jury could have found [that] . . . [the
defendant] appropriated the currency at some time after leaving the cafeteria
and before entering the front office . . . [and the defendant] stated that
there was an extra deposit in the bag when there was not.”  Id.
at 50.  The court concluded that “the
evidence was such that a rational jury could have found the essential elements
of the offense beyond a reasonable doubt.” 
Id. at 51.  

Here, viewing the
evidence in the light most favorable to the prosecution, the evidence reflects
the following: (1) contrary to her assertions, appellant had exclusive
possession of the cafeteria proceeds every afternoon as she was tasked with
counting and verifying the amount of money received; (2) the cashiers at each
cafeteria completed and sent to appellant’s office, along with the money, an
accounting sheet, a cash sheet, and a deposit slip and appellant was supposed
to keep accurate records of each; (3) appellant’s records frequently omitted
all of the original forms and instead contained new, completely rewritten
deposit slips or originals that had been altered; (4) from 2002 to 2004, there
was a discrepancy of $80,913.60 from the amount of money actually deposited in
the bank and the amount of money received at the cafeterias as reflected in the
cashiers’ accounting; (5) Clugston and Parnell investigated the cashiers,
cafeteria managers, and Bracewell, who was the employee instructed to transport
the bags to appellant, and determined they were not the source of the
discrepancies; and (6) from January 2002 to April 2005, appellant made
cash-only deposits totaling $87,375 and $35,970 respectively into two of her
bank accounts.  It is true, as asserted by
appellant, that the State provided no direct evidence that she appropriated any
of the missing money.  However, the
elements of theft may also be proved by circumstantial evidence.  See
Christensen v. State, 240 S.W.3d 25, 32 (Tex. App.—Houston [1st Dist.]
2007, pet. ref’d); see also Hogan v.
State, No. 11-10-00001-CR, 2011 WL 4840528 (Tex. App.—Eastland Oct. 13,
2011, pet. ref’d) (mem. op.) (holding that evidence was legally sufficient to
support conviction of bank teller for theft even though money in question was
“handled by any number of people who could have taken [the] currency” and there
was no direct evidence that teller had taken money).  

We conclude that the
jury could have reasonably inferred and found beyond a reasonable doubt that
appellant destroyed or altered the accounting forms she received from the
cafeterias and unlawfully appropriated money from NISD, with the intent to
deprive it of the money, in the afternoons that she was to verify the amount of
money received from the cafeteria.  See Tex.
Penal Code Ann. § 31.03(a).  
Furthermore, we conclude that the jury could have reasonably inferred
and found beyond a reasonable doubt that appellant, holding the money as a
fiduciary, knowingly misapplied the money in a manner that involved substantial
risk of loss to the school district.  See
id. § 32.45(b). 
Accordingly, we hold that the evidence is legally sufficient to support
appellant’s convictions.

We overrule
appellant’s first issue.

Jury
Charge

In her second issue,
appellant argues that because the trial court, in its charge to the jury,
instructed the jury that it had to reach a unanimous “verdict,” as opposed to
“verdicts,” the court “failed to instruct the jury that its decision on each
offense had to be individually unanimous.”  In her third issue, appellant argues that the
trial court committed reversible error in denying her motion to include a
charge on “circumstantial evidence and the alternative perpetrator hypothesis”
because recent changes in the law on the factual sufficiency of evidence
necessitate such instructions.

Unanimous Verdict

We review jury charge
error by considering whether (1) error exists in the charge and (2) if so,
whether sufficient harm resulted from the error to require reversal.  Ngo v.
State, 175 S.W.3d 738, 744 (Tex. Crim. App. 2005).  Jury unanimity is required to obtain a
criminal conviction.  Tex. Const.
art. V, § 13; Tex. Code Crim.
Proc. Ann. art. 36.29(a)
(Vernon Supp. 2011); Ngo, 175 S.W.3d
at 745.  Each and every
juror must agree that the defendant committed the same, single, specific
criminal act.  Ngo, 175 S.W.3d at 745.  Non-unanimity
may result “when the jury charge fails to properly instruct the jury, based on
the indicted offense(s) and specific evidence in the case, that its verdict
must be unanimous.”  Cosio v. State, 353 S.W.3d 766, 771 (Tex. Crim. App. 2011).  

          In
support of her argument that she was deprived of her right to a unanimous
verdict, appellant chiefly relies on Ngo
v. State, 175 S.W.3d 738.  However,
in Ngo, the prosecution charged the
defendant with “three offenses in three separate paragraphs within a single
count of one indictment.”  Id. at 744.  The court noted that the State had “rel[ied]
on a laundry list of different criminal acts and let the individual jurors take
their pick on which each believe[d] the defendant committed.”  Id.
at 745.   Here, however, given the trial
court’s charge to the jury, it is clear that the jury convicted appellant of
two separate offenses, each unanimously. 
Although appellant seizes on the language in the jury charge that
required the jury to “unanimously agree[] on a verdict,” as opposed to
“verdicts,” the jury charge did instruct the jury to indicate the unanimous
verdict “by filling in the appropriate form attached to this Charge,” and the
jury ultimately found appellant “guilty” of each offense on two separate
verdict forms, one for each offense.  See Martinez v. State, 225 S.W.3d 550,
555 (Tex. Crim. App. 2007) (noting that simplest way to ensure each allegation
is decided unanimously is to submit separate verdict forms); Torres v. State, No. 04-07-00873-CR,
2008 WL 5264869, at *4 (Tex. App.—San Antonio Dec. 17, 2008, pet. ref’d)
(holding that there was no jury charge error because “the jury was instructed
that it must reach a unanimous verdict and because separate application
paragraphs and separate verdict forms were included with regard to each
count”).  This is unlike the situation in
Ngo where the counts were submitted
to the jury disjunctively in a single application paragraph.  See id.
at 742 n.5.  Accordingly, we hold the
trial court’s charge to the jury did not deprive appellant of her right to a
unanimous verdict in each separate case.

          We
overrule appellant’s second issue.

 

 

Circumstantial Evidence
Instruction

          In
her third issue, appellant asserts that the trial court erred in denying her
requested instruction on circumstantial evidence and the “reasonable hypothesis
of guilt theory.”  Appellant’s requested
instruction would have stated that, in a circumstantial evidence case, the
prosecution “must exclude to a moral certainty every other reasonable
hypothesis to accept the defendant’s guilt, and unless they do so beyond a
reasonable doubt, [the jury] will find the defendant not guilty.”

          The
Texas Court of Criminal Appeals has discarded the “reasonable hypothesis of
guilt” theory as both a jury instruction and an appellate standard of
review.  Geesa v. State, 820 S.W.2d 154, 161–62 (Tex. Crim. App. 1991).  Appellant argues that because criminal
defendants can no longer raise a factual-sufficiency challenge on appeal, and
because juries are no longer charged on the definition of the reasonable doubt
standard, “the need for a circumstantial evidence charge is resurrected.”  See
Brooks v. State, 323 S.W.3d 893, 902 (Tex. Crim. App. 2010) (abolishing
factual-sufficiency review on appeal in criminal cases); Paulson v. State, 28 S.W.3d 570, 573 (Tex. Crim. App. 2000)
(eliminating requirement that juries be instructed on definition of “beyond a
reasonable doubt”).  However, in Geesa, the court repudiated “the very
basis and authorization for the use of the ‘reasonable hypothesis’ construct in
reviewing sufficiency of the evidence in circumstantial evidence cases,” and
its holding was not limited to legal-sufficiency review.  Geesa,
820 S.W.3d at 159.  Furthermore, “[t]o
find that a repudiation of the ‘beyond a reasonable doubt’ instruction
necessarily means a return to jury instructions on circumstantial evidence
would be to follow the same logic criticized by the court in Paulson.”  Filoteo
v. State, No. 01-02-00693-CR, 2003 WL 22723480, at *2 (Tex. App.—Houston
[1st Dist.] Nov. 20, 2003, pet. ref’d) (mem. op.) (citing Paulson, 28 S.W.3d at 572). 
Accordingly, we hold that the trial court did not err in not submitting
appellant’s requested jury instructions on circumstantial evidence and the
“reasonable hypothesis of guilt.”

          We
overrule appellant’s third issue.

Conclusion

          We
affirm the judgment of the trial court.  

 

 

                                                                   Terry
Jennings

                                                                   Justice


 

Panel
consists of Justices Jennings, Massengale, and Huddle.

Do
not publish.  Tex. R. App. P. 47.2(b).

 











[1]           See
Tex. Penal Code Ann. § 31.03(b), (e)(5)
(Vernon Supp. 2011).

 





[2]           See id. § 32.45(c)(5) (Vernon 2011).